631 A.2d 597

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**David Allen SATTAZAHN, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 11, 1992.

Filed July 30, 1993.

Reargument Denied Oct. 6, 1993.

414

416

418

John Elder, Reading, for appellant.

Carolyn Lanzillo, Asst. Dist. Atty., Reading, for Com., appellee.

Before ROWLEY, President Judge, and WIEAND and HUDOCK, JJ.

PER CURIAM:

David Allen Sattazahn was tried by jury and was found guilty of murder of the first degree, robbery, aggravated assault (two counts), possession of an instrument of crime, carrying a firearm without a license, and several conspiracies in connection with the robbing and killing of the manager of a family restaurant in Berks County.[1] Post-trial motions were denied, and Appellant was sentenced to life imprisonment for first degree murder. He was also sentenced to serve consecutive terms of imprisonment of not less than five (5) years nor more than ten (10) years for robbery, not less than five (5) years nor more than ten (10) years for conspiracy to commit robbery, not less than one (1) year nor more than two (2) years for possessing instruments of crime, and not less than one (1) year nor more than two (2) years for carrying a firearm without a license.[2] On direct appeal from the judgment of sentence, Appellant argues that there was insufficient evidence to sustain his convictions for first degree murder, conspiracy to commit third degree murder, conspiracy to commit aggravated assault and carrying a firearm without a license. He contends also that a new trial should be granted because of (1) prosecutorial misconduct; (2) improper evidence pertaining to the Commonwealth's plea agreement with Appellant's co-conspirator; and (3) erroneous jury instructions.

In evaluating a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the Commonwealth, which has won the verdict. We then determine whether the evidence is sufficient to permit a jury

1. The trial court sustained a defense demurrer to a charge of criminal conspiracy to commit first degree murder, and the jury found Appellant not guilty of criminal conspiracy to commit second degree murder.

2. The several additional offenses of which Appellant was found guilty were deemed to merge for purposes of sentencing.

to determine that each and every element of the crimes charged was established beyond a reasonable doubt. *See Commonwealth v. Smith*, 523 Pa. 577, 581, 568 A.2d 600, 602 (1989); *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990). It is the function of the jury to pass upon the credibility of the witnesses and to determine the weight to be accorded the evidence produced. The jury is free to believe all, part or none of the evidence introduced at trial. *See Commonwealth v. Rose*, 463 Pa. 264, 268, 344 A.2d 824, 826 (1975); *Commonwealth v. Verdekal*, 351 Pa.Super. 412, 419–420, 506 A.2d 415, 419 (1986). The facts and circumstances established at trial "need not be absolutely incompatible with [the] defendant's innocence, but the question of any doubt is for the jury unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.'" *Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977), (*quoting Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A.2d 95, 97 (1943)).

The evidence at Appellant's trial established that on Palm Sunday, April 12, 1987, at or about 11:00 p.m., Richard Boyer, the manager of the Heidelberg Family Restaurant, had closed the restaurant and was walking to his car, carrying the day's receipts in a bank deposit bag, when Appellant and Jeffrey Scott Hammer emerged from a wooded area behind the restaurant, where they had been lying in wait, and demanded that Boyer surrender the bank deposit bag. Boyer initially raised his hands and attempted to throw the bag in the direction of the restaurant building. Appellant then told Boyer to retrieve the bag and to bring it to him. In response to Appellant's demand, Boyer walked over and retrieved the bag. However, he again threw the bag in the direction of the restaurant and began to run away. When Boyer fled, both Appellant and Hammer fired their guns in his direction. Hammer, who was carrying a .41 caliber Magnum revolver, fired once over Boyer's head. Appellant, however, fired his .22 caliber Ruger, semi-automatic pistol five times, striking

Boyer twice in the lower back and once in the left shoulder, the lower portion of his face and the back of the head. Appellant retrieved the bank deposit bag, and he and Hammer fled the scene. Boyer's body was discovered early the next morning by a waitress when she arrived for work. He had died as a result of gunshot wounds.

More than two years later, on July 12, 1989, while being questioned by police, Jeffrey Hammer gave a statement which implicated himself and Appellant in the robbery and shooting of Richard Boyer. According to Hammer, he and Appellant had been planning the robbery for sometime and had, on four or five weekends prior to the robbery, gone to the restaurant to observe the movements of the manager. On the night of the robbery, Hammer and Appellant went to an abandoned factory, where they had been storing guns, and then drove on railroad tracks in a 3–wheeler, all terrain vehicle to a location near the restaurant. Hammer told police that when he fired at Richard Boyer, he intended to shoot over Boyer's head as a warning. Hammer said that his and Appellant's plan had been only to commit a robbery and that they had not intended to commit a murder. After the robbery and shooting of Boyer, Hammer said, he and Appellant had run to their vehicle and returned to the abandoned factory via the railroad tracks. Along the way, they lost the black duffel bag in which they had placed their guns. The bag, which was lying along the railroad tracks in the vicinity of the abandoned factory, was subsequently found by two brothers. The guns were turned over to police on July 13, 1989, after the police had conducted a search of the factory based upon information provided to them by Jeffrey Hammer. The .22 caliber gun used to kill Boyer had been purchased by Appellant and had been registered in his name.

To prove murder of the first degree, it was necessary for the Commonwealth to prove that Appellant willfully, deliberately, and with premeditation had killed Richard Boyer. *See Commonwealth v. McNair,* 529 Pa. 368, 373, 603 A.2d 1014, 1017 (1992); *Commonwealth v. Lee,* 401 Pa.Super. 591, 602, 585 A.2d 1084, 1089 (1991). "A criminal homicide consti-

tutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S. § 2502(a). *See Commonwealth v. Chester,* 526 Pa. 578, 589, 587 A.2d 1367, 1372 (1991), *cert. denied,* —— U.S. ——, and ——, 112 S.Ct. 152 and 422, 116 L.Ed.2d 117 and 442 (1992); *Commonwealth v. Carbone,* 524 Pa. 551, 560, 574 A.2d 584, 588 (1990). It is the element of a specific intent to kill which distinguishes first degree murder from all other grades of homicide. *See Commonwealth v. Holzer,* 480 Pa. 93, 98, 389 A.2d 101, 104 (1978); *Commonwealth v. Moore,* 473 Pa. 169, 174, 373 A.2d 1101, 1104 (1977).

■ The case law in Pennsylvania has "consistently held that the requirement of premeditation and deliberation is met whenever there is a conscious purpose to bring about death." *Commonwealth v. O'Searo,* 466 Pa. 224, 239–240, 352 A.2d 30, 37 (1976). *See Commonwealth v. Jones,* 355 Pa. 522, 525–526, 50 A.2d 317, 319 (1947). The cases further hold that the specific intent to kill "can be formulated in a fraction of a second." *Commonwealth v. O'Searo, supra* 466 Pa. at 240, 352 A.2d at 37–38 (footnote omitted). *See also Commonwealth v. Thornton,* 494 Pa. 260, 267, 431 A.2d 248, 252 (1981); *Commonwealth v. Chimenti,* 362 Pa.Super. 350, 383, 524 A.2d 913, 929 (1987). A specific intent to kill can be inferred from the circumstances surrounding an unlawful killing. *See Commonwealth v. Bundy,* 458 Pa. 240, 244, 328 A.2d 517, 519 (1974); *Commonwealth v. Jones,* 391 Pa.Super. 292, 305, 570 A.2d 1338, 1345 (1990). Because a person generally intends the consequences of his act, a specific intent to kill may be inferred from the fact that the accused used a deadly weapon to inflict injury to a vital part of the victim's body. *Commonwealth v. O'Searo, supra* 466 Pa. at 236–239, 352 A.2d at 36–37. *See also Commonwealth v. McCullum,* 529 Pa. 117, 137, 602 A.2d 313, 323 (1992); *Commonwealth v. Duffey,* 519 Pa. 348, 357, 548 A.2d 1178, 1182 (1988); *Commonwealth v. Terry,* 513 Pa. 381, 409, 521 A.2d 398, 412 (1987), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987); *Commonwealth v. Bishop,* 489 Pa. 96, 106, 413 A.2d 1031, 1035–1036 (1980).

■ Instantly, the evidence suggests that, during the course of committing a robbery, Appellant became irritated when the victim failed to comply with his directions. When the victim also attempted to flee, Appellant fired five gunshots into vital areas of the victim's body, causing death. Although Appellant may initially have intended only to rob the victim, his subsequent actions, when the victim failed to cooperate, were of a type sufficient to permit an inference that Appellant had formed an intent to kill his victim and had acted upon that intention, thereby causing the victim's demise. As such, Appellant's conviction for a willful and deliberate killing was supported by competent evidence.

■ We are constrained to agree, however, that the Commonwealth failed to prove Appellant's guilt of conspiring to commit the crimes of third degree murder and aggravated assault. The crime of criminal conspiracy is defined by statute as follows:

(a) **Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a). "The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished." *Commonwealth v. Keefer*, 338 Pa.Super. 184, 190, 487 A.2d 915, 918 (1985). *See also Commonwealth v. Derr*, 501 Pa. 446, 462 A.2d 208 (1983); *Commonwealth v. French*, 396 Pa.Super. 436, 440, 578 A.2d 1292, 1294 (1990), *aff'd.*, 531 Pa. 42, 611 A.2d 175 (1992). Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. *Commonwealth*

*v. Schomaker,* 501 Pa. 404, 409–410, 461 A.2d 1220, 1222–1223 (1983); *Commonwealth v. Horner,* 497 Pa. 565, 570, 442 A.2d 682, 684 (1982).

Appellant was charged by criminal information with conspiracies to commit third degree murder and two counts of aggravated assault based upon an alleged agreement with Jeffrey Hammer to maliciously kill the victim, to inflict serious bodily injury upon the victim by shooting him with a handgun, and to cause bodily injury to the victim with a deadly weapon, to-wit, a handgun. At trial, however, Jeffrey Hammer, the alleged co-conspirator, testified that he and Appellant had agreed to commit a robbery, but had not planned to kill the victim. Hammer said that he and Appellant had carried guns only for the purpose of intimidating their victim. Although acknowledging that he had fired a shot over the victim's head, Hammer explained that it had been intended as a warning shot. He denied that there had been any agreement at any time to kill the manager. Their plan, rather, had been to handcuff him and put him in the back of his truck.

There was no other evidence suggesting a different agreement. The evidence, therefore, established only that Appellant had conspired with Hammer to commit the crime of robbery. There was no evidence that Hammer had ever been party to an agreement with Appellant to shoot the robbery victim or otherwise cause serious bodily injury or death. Rather, the evidence was that Appellant had formed a separate intent to shoot and kill the victim only after the victim had failed to comply with Appellant's directives. It follows that Appellant's convictions for conspiracy to commit third degree murder and on two counts of conspiracy to commit aggravated assault, as charged, were unsupported by competent evidence.

Moreover, even if there was evidence suggesting that Appellant and Hammer had agreed to commit several offenses, it is provided at 18 Pa.C.S. § 903(c) that "[i]f a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object

of the same agreement or continuous conspiratorial relationship." Instantly, the Commonwealth did not prove that there were separate and distinct agreements between Hammer and Appellant to commit the crimes of murder, robbery and aggravated assault. Rather, the evidence demonstrated that there was a single agreement to commit a robbery and that the shooting death of Richard Boyer occurred during the continuation of that initial conspiratorial relationship between Appellant and Hammer. Therefore, under the evidence, Appellant could properly be convicted of only a single count of criminal conspiracy.[3]

 Appellant has also challenged the sufficiency of the evidence to sustain his conviction for carrying a firearm without a license. This offense is defined by statute as follows:

> (a) **Offense defined.**—No person shall carry a firearm in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as provided in this subchapter.

18 Pa.C.S. § 6106(a). Here, the evidence was clearly sufficient to establish that Appellant and Hammer had transported their weapons in an all terrain vehicle to and from the scene of their crime and that they had concealed the weapons on their persons while waiting for the victim to close the restaurant and leave with the day's receipts. The evidence also established that Appellant did not have a valid license to carry firearms or a valid provisional firearm registration permit. The evidence, therefore, was sufficient to establish beyond a reasonable doubt that Appellant had unlawfully carried a firearm without a license.

At the request of the Commonwealth, the trial court instructed the jury as follows:

> In the trial of a person for committing a crime of violence, and a crime of violence is defined in the law as a murder, robbery or aggravated assault, if you are satisfied, you, the

---

**3.** Appellant has not challenged his conviction for the additional offense of conspiracy to possess an instrument of crime.

jury, are satisfied, beyond a reasonable doubt, that the defendant was armed with a firearm, as I have defined it, he used or attempted to use this firearm and had no license to carry the same, this shall be evidence of his intention to commit said crimes of violence.

Appellant contends that this instruction violated his right to due process under both the United States and Pennsylvania Constitutions in that there is no rational basis for inferring an intent to commit a crime of violence from the absence of a license to carry a firearm. We are, therefore, called upon to construe the statute in question which reads:

## § 6104. Evidence of intent

In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a firearm, used or attempted to be used, and had no license to carry the same, shall be evidence of his intention to commit said crime of violence.[4]

18 Pa.C.S. § 6104. The jury instruction was based upon the language contained in Section 6104.

In construing a legislative enactment, we must consider, among other things, the following principles of statutory construction:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

---

4. A "crime of violence" is defined at Section 6102 of the Act in the following manner:

"**Crime of violence.**" Any of the following crimes, or an attempt, a solicitation or a conspiracy to commit any of the same, namely: murder, voluntary manslaughter, rape, aggravated assault, robbery, burglary, involuntary deviate sexual intercourse, arson, extortion accompanied by threats of violence, assault by prisoner, assault by life prisoner and kidnapping.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

\* \* \* \* \* \*

(6) The consequences of a particular interpretation.

1 Pa.C.S. § 1921. We are also guided by certain presumptions in ascertaining legislative intent:

In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used:

\* \* \* \* \* \*

(3) That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth.

1 Pa.C.S. § 1922.

The phrase "shall be evidence of his intention to commit said crime of violence" is, on its face, unclear regarding whether the presumption favored by the statute is mandatory or permissive. This is the crux of Appellant's argument. We have found no case in which a court attempted to use the statute as a basis for a jury instruction. Our research also has failed to disclose any real attempt by an appellate court to come to grips with and interpret the statute.

Criminal intent, as a general rule, is an essential element of a crime charged. *In the Interest of G.T.*, 409 Pa.Super. 15, 19, 597 A.2d 638, 640 (1991); *Commonwealth v. Hogan*, 321 Pa.Super. 309, 313, 468 A.2d 493, 495 (1983). It must be proved by the Commonwealth beyond a reasonable doubt. Although the legislature, by statute, may create inferences and presumptions, the facts proved must bear a rational relationship to the fact to be inferred. If they do not, the statutory inference or presumption cannot stand.

With respect to the validity of statutory presumptions, the United States Supreme Court has observed:

[A] statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ulti-

mate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience. This is not to say that a valid presumption may not be created upon a view of relation broader than that a jury might take in a specific case. But where the inference is so strained as not to have a reasonable relation to the circumstances of life as we know them it is not competent for the legislature to create it as a rule governing the procedure of the courts.

*Tot v. United States,* 319 U.S. 463, 467–468, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519, 1524 (1943) (footnotes omitted). *See also Leary v. United States,* 395 U.S. 6, 33–34, 89 S.Ct. 1532, 1546–1547, 23 L.Ed.2d 57, 80 (1969); *Commonwealth v. DiFrancesco,* 458 Pa. 188, 194–195, 329 A.2d 204, 208 (1974). "If the inference the jury is allowed to draw from the facts proven by the Commonwealth is arbitrary, because of a lack of connection between the two, due process is fatally lacking." *Commonwealth v. Shaffer,* 447 Pa. 91, 109, 288 A.2d 727, 737 (1972), *cert. denied,* 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116 (1972). *See also Commonwealth v. McFarland,* 452 Pa. 435, 439, 308 A.2d 592, 594 (1973); *Commonwealth v. Burke,* 229 Pa.Super. 176, 179, 324 A.2d 525, 526 (1974). Therefore,

a criminal statutory presumption must be regarded as "irrational" or "arbitrary," and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend. And in the judicial assessment the · [legislative] determination favoring the particular presumption must, of course, weigh heavily.

*Leary v. United States, supra* 395 U.S. at 36, 89 S.Ct. at 1548, 23 L.Ed.2d at 82.[5] *See also Turner v. United States,* 396 U.S.

5. "[W]here the sole evidence of guilt or an element of the offense is inferential, then the inferred fact must follow beyond a reasonable doubt from the proved facts. This necessarily follows from the burden placed upon the Commonwealth to prove every element of an offense beyond a reasonable doubt." *Commonwealth v. Jones,* 242 Pa.Super. 471, 479, 364 A.2d 368, 372 (1976). *See Commonwealth v. DiFrancesco, supra* 458 Pa. at 195–197, 329 A.2d at 209–210. *See also Commonwealth v. Horton,* 465 Pa. 213, 221–224 and n. 17, 348 A.2d 728, 732–

398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); *Commonwealth v. Owens,* 441 Pa. 318, 271 A.2d 230 (1970) (plurality opinion).

In *Commonwealth v. Bonomo,* 396 Pa. 222, 151 A.2d 441 (1959), the Pennsylvania Supreme Court stated:

> Since [the presumption of innocence] is with the defendant not only at the beginning of the trial but throughout all its stages, and even while the jury is considering its verdict, it is obvious that no contrary presumption can be indulged. Hence it has been said that all presumptions independent of evidence are in favor of innocence. Watkins v. Prudential Insurance Co., 315 Pa. 497, 173 A. 644, 95 A.L.R. 869. It is the law that in a criminal case, unlike a civil case, no binding instruction may be given in favor of the prosecution. This is true whether the evidence upon which the prosecution rests is oral or documentary and is equally true no matter how strong the proof proffered by the prosecution may be. It is because of this never-shifting burden upon the Commonwealth to prove every essential element of the charge it makes against the defendant that it cannot logically be said that the Commonwealth has the burden to prove the presence of such element while the defendant, at the same time, has the burden of proving its absence.

*Id.* at 229–230, 151 A.2d at 445–446. In keeping therewith, the Supreme Court has "held that, 'virtually all so-called "criminal presumptions" are really no more than permissible inferences.'" *Commonwealth v. Mason,* 483 Pa. 409, 413, 397 A.2d 408, 411 (1979), (*quoting Commonwealth v. DiFrancesco, supra* 458 Pa. at 193 n. 3, 329 A.2d at 208 n. 3). When dealing with a statutory presumption, "where the presumed fact comprises an element of the crime charged, the inference authorized by a presumption can *never* be compelled by the court." *Commonwealth v. DiFrancesco, supra.* The due process clause, therefore, prevents a court from giving the Commonwealth the benefit of an instruction which, on the basis of a presumption, has the effect of relieving the prosecution from

733 and n. 17 (1975); *Commonwealth v. Turner,* 456 Pa. 116, 121 n. 3, 317 A.2d 298, 300 n. 3 (1974); *Commonwealth v. Deer,* 419 Pa.Super. 321, 325, 615 A.2d 386, 388 (1992).

its burden of proving beyond a reasonable doubt all of the elements of the crimes charged. *See Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

The trial court in the instant case interpreted the statute in such a manner as to relieve the Commonwealth from its burden of proving by evidence that Appellant acted with intent to commit the crimes of murder, robbery, and aggravated assault. It told the jury, in effect, that if it believed Appellant had had in his possession and had used an unlicensed firearm, this fact alone "shall be evidence of his intention to commit said crimes of violence." This, we are constrained to agree with Appellant, was improper. In effect, the trial court, by reading the language of the statute without any qualifying language, let the jury believe that the presumption created by the statute was a conclusive presumption. In examining jury instructions, it is important to look at the charge as a whole and not base a decision on isolated excerpts. *Commonwealth v. Prosdocimo,* 525 Pa. 147, 578 A.2d 1273 (1990). We have examined the entire jury charge and find that in three other places the trial court gave instructions involving the use of presumptions. The following is but one example of the language chosen by the court:

> When deciding whether the defendant had the specific intent to kill you should consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind. Additionally, if you believe that the defendant intentionally used a deadly weapon on a vital part of the victim's body, you *may* regard that as an item of circumstantial evidence from which you *may, if you choose,* infer that the defendant had the specific intent to kill.

(Emphasis added). It is clear from this excerpt that the trial court gave an instruction regarding the presumption of intent to kill from the use of a deadly weapon on a vital part of the victim's body. In this instruction, the court qualified the presumption language by stating that the jury *may* infer *if it chose,* but that it did not have to follow the presumption. No

such qualifying language appears in that part of the jury instruction regarding § 6104 quoted *infra*. Use of this language would have properly informed the jury that the presumption created by § 6104 was permissive rather than conclusive. It is reasonable to find that the jury, therefore, understood the court's instruction as one calling for a mandatory presumption, which is impermissible.

The trial court's error in fashioning a jury instruction according to the language of the statute without qualification was not harmless. The instruction permitted the jury to find that Appellant intended to commit an intentional killing, i.e., murder of the first degree, as well as robbery and aggravated assault, merely because the gun, which he had in his possession and which he used, was unlicensed. To find otherwise would be to suggest that the legislature intended to create a statute which flies in the face of the United States and Pennsylvania State Constitutions for use of conclusive presumptions. *Commonwealth v. DiFrancesco, supra; Sandstrom v. Montana, supra*. We cannot find that the legislature would intend that result. 1 Pa.C.S. § 1922(3). To remedy this error a new trial is required.[6]

---

6. We likewise find a rational connection between the licensing or failure to license a firearm and the intent with which a person acts in using that firearm.

The legislature has recognized a distinction between prohibited offensive weapons which have no peaceful purpose and "shall not be allowed to exist in our society", *Commonwealth v. Adams*, 245 Pa.Super. 431, 436, 369 A.2d 479, 482 (1976), and those which have peaceful as well as lethal potentialities. *Cf. Commonwealth v. Stewart*, 343 Pa.Super. 514, 532, 495 A.2d 584, 593 (1985). The former are banned absolutely because criminal usage is conclusively presumed, while the latter are allowed, if licensed. The obtaining of a license is tantamount to an acknowledgment that the possession is for lawful purposes; the failure to obtain a license suggests the opposite. One who envisions no criminal purpose for the firearm is unlikely to refuse, if required, to declare his ownership of that weapon to the proper authorities, while one who harbors criminal intentions will. This is not to say that in every instance the lack of a license suggests criminal intent, but rather that a lack of required license is simply another piece of circumstantial evidence from which the true intent of the user of a firearm might be ascertained in a given situation.

Although this case involves whether Appellant had a license to *carry* the firearm, rather than a license merely to *own* the firearm, the same

 We find no merit in Appellant's remaining arguments. The decision to grant or deny a motion for mistrial is within the sound discretion of the trial court. A mistrial is necessary only when an incident upon which a motion for mistrial is based is of such a nature as to deny the defendant a fair trial. *Commonwealth v. Crawley,* 514 Pa. 539, 554, 526 A.2d 334, 342 (1987). *See also Commonwealth v. Chestnut,* 511 Pa. 169, 176, 512 A.2d 603, 606 (1986); *Commonwealth v. Hernandez,* 498 Pa. 405, 415, 446 A.2d 1268, 1273 (1982). "[W]hen prompt curative or cautionary instructions are given by the court, an abuse of discretion [in denying a motion for mistrial] will not readily be found." *Commonwealth v. Meadows,* 381 Pa.Super. 354, 360, 553 A.2d 1006, 1009 (1989). *See also Commonwealth v. Lawson,* 519 Pa. 175, 185, 546 A.2d 589, 594 (1988); *Commonwealth v. Thomas,* 361 Pa.Super. 1, 15, 521 A.2d 442, 449 (1987).

In his opening statement, the prosecuting attorney told the jury:

The testimony will further show in this case that shortly after the murder of Richard Boyer the defendant was overheard threatening Jeffrey Hammer, threatening him for losing the bag and threatening him that if he got caught, he would seek revenge on Jeffrey Hammer. He would kill Jeffrey Hammer, too.

Appellant moved for a mistrial, which the court denied. A cautionary instruction to the jury was then given as follows:

THE COURT: Ladies and gentlemen, at this time I want to underscore that speeches of counsel are not evidence in this case and that what you will decide this case upon is what the witnesses will say.

I also am going to specifically instruct you at this time that you are to disregard the last remarks of counsel with regard to the alleged substance of any statement that the defendant may have been overheard saying to Mr. Hammer sometime after the alleged offense.

reasoning is sound in reaching the result that there is a rational connection between the licensing and the intent to commit criminal acts with that firearm.

When the statement was made by the prosecuting attorney, the Commonwealth had anticipated calling as a witness one Fritz Wanner, who was to relate a conversation between Appellant and Jeffrey Hammer in which Appellant had implicated himself in the robbery and killing of Richard Boyer. Later in the trial, however, the prosecutor told the court that the witness was refusing to testify because of death threats which had been made against him. The prosecuting attorney, therefore, decided not to call Wanner as a witness. At this point, the defense again moved for a mistrial. This motion was also denied. Appellant contends that the trial court's rulings were erroneous.

A prosecuting attorney's opening statement should be limited to a statement of the facts which he intends to prove at trial and any legitimate inferences which may be drawn from such facts. *See Commonwealth v. Duffey, supra*, 519 Pa. at 361, 548 A.2d at 1184; *Commonwealth v. Fairbanks*, 453 Pa. 90, 95, 306 A.2d 866, 868–869 (1973). "Thus, the crucial test is whether there was a reference to evidence absent a good faith and reasonable basis for believing that such evidence in fact was available and would be admissible." *Commonwealth v. Farquharson*, 467 Pa. 50, 63–64, 354 A.2d 545, 552 (1976). *See also Commonwealth v. Jones*, 530 Pa. 591, 609, 610 A.2d 931, 938–939 (1992). Moreover, even when remarks made by the prosecutor in his opening statement are improper, the defendant will not be entitled to a mistrial unless the remarks were so prejudicial as to render the jury incapable of returning a fair verdict. *See Commonwealth v. Duffey, supra* 519 Pa. at 361–362, 548 A.2d at 1184; *Commonwealth v. Martin*, 461 Pa. 289, 294, 336 A.2d 290, 292 (1975).

At the time of making his opening statement, the prosecuting attorney had no reason to believe that he would be unable to call Fritz Wanner as a witness at Appellant's trial. It was only when it was later discovered that the witness was refusing to testify because of alleged death threats that the decision was made not to call him as a witness. Under these circumstances, there is no merit in the

defense argument that the prosecuting attorney was guilty of misconduct. *See Commonwealth v. McNair, supra* 529 Pa. at 374–375, 603 A.2d at 1017–1018.

 During opening argument, the prosecutor had not referred to Wanner by name, but had spoken only of a witness who had overheard a conversation between Appellant and Jeffrey Hammer. The reference was brief and was not of such a nature as to have created prejudice, rendering the jury incapable of returning a fair verdict. When the statement was made to the jury, the court instructed the jury to ignore it. When it later became apparent that the witness would not testify, it was not error for the trial court to deny a renewed motion for mistrial.

Appellant also contends that the trial court should have granted defense motions for mistrial because of two references to prior criminal activity by Appellant. The Superior Court has reviewed the applicable law as follows:

Clear references to prior unrelated criminal conduct by a defendant generally warrant the granting of a defense motion for mistrial, because the commission of one crime is not proof of the commission of another and because the effect of such evidence is to create unfair prejudice against the defendant. *Commonwealth v. Morris*, 493 Pa. 164, 175, 425 A.2d 715, 720 (1981); *Commonwealth v. Riggins*, 374 Pa.Super. 243, 251, 542 A.2d 1004, 1008 (1988); *Commonwealth v. Thomas*, 361 Pa.Super. 1, 14–15, 521 A.2d 442, 449–450 (1987). However, not all references which may indicate prior criminal activity warrant reversal. Mere "passing references" to prior criminal activity will not necessarily require reversal unless the record illustrates definitively that prejudice resulted from the reference. *Commonwealth v. Nichols*, 485 Pa. 1, 4, 400 A.2d 1281, 1282 (1979); *Commonwealth v. Riggins, supra.* The nature of the reference and whether the remark was intentionally elicited by the Commonwealth are additional factors to be considered in determining whether a mistrial is necessary. *Commonwealth v. Pursell*, 508 Pa. 212, 230, 495 A.2d 183, 192 (1985); *Commonwealth v. Williams*, 470 Pa. 172, 178, 368 A.2d 249,

252 (1977). See also: *Commonwealth v. Richardson*, 496 Pa. 521, 437 A.2d 1162 (1981); *Commonwealth v. McEachin*, 371 Pa.Super. 188, 537 A.2d 883 (1988); *Commonwealth v. Maute*, 336 Pa.Super. 394, 485 A.2d 1138 (1984). Moreover, "[a]n immediate curative instruction to the jury may alleviate [the] harm [which would otherwise result] from reference to prior criminal conduct." *Commonwealth v. Morris*, 513 Pa. 169, 176, 519 A.2d 374, 377 (1986). See also: *Commonwealth v. Lawson*, 519 Pa. 175, 546 A.2d 589 (1988); *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689 (1986); *Commonwealth v. Kubiac*, 379 Pa.Super. 402, 550 A.2d 219 (1988).

*Commonwealth v. Bonace*, 391 Pa.Super. 602, 608–609, 571 A.2d 1079, 1082 (1990). *See also Commonwealth v. Zook*, 532 Pa. 79, 96, 615 A.2d 1, 9–10 (1992); *Commonwealth v. Phillips*, 398 Pa.Super. 58, 70–71, 580 A.2d 840, 846 (1990).

 The first such reference was during the Commonwealth's direct examination of Jeffrey Hammer, when the following occurred:

Q You went across the railroad tracks to this old furnace building. What happened at this point?

A We had stolen guns there.

Q Excuse me.

The trial court refused a defense motion for mistrial but cautioned the jury as follows:

THE COURT: Ladies and gentlemen, there has been an objection and the Court has sustained the objection to the last volunteered statement of this witness. We are striking that statement from the evidence and you will not consider it, the last portion of the testimony of this witness. It was unresponsive; it is not part of this evidence.

We perceive no abuse of discretion by the trial court in denying the defense motion for mistrial. The remark had been volunteered by the witness and constituted nothing more than a passing reference to the manner in which the guns had been obtained. It did not expressly implicate Appellant in the taking of the guns. In any event, however, the fact that the

guns had been stolen was a relevant part of the conspiracy and of the preparations made by Appellant and Hammer to commit the crime of robbery. Finally, the trial court instructed the jury to disregard the witness's volunteered statement, and the prosecution did not again make reference thereto. With respect to this incident, Appellant received a more favorable ruling than he was entitled to receive. The trial court's ruling is not a proper basis for awarding a new trial.

 The final alleged reference to prior criminal activity occurred during the redirect examination of Jeffrey Hammer, when the prosecuting attorney asked the witness:

Q These other ten cases, ten burglaries, two robberies, total of 12 other cases, did you have a co-conspirator in those cases?

Before the witness could answer, defense counsel objected and the prosecuting attorney requested a side bar conference. Following a lengthy discussion in chambers with both counsel, the trial court ruled as follows:

THE COURT: Ladies and gentlemen, the Court has sustained the objection to the last question of—objection by defense counsel to the last question of the prosecution.

Mr. Baldwin, you may rephrase the question and ask another one.

The prosecutor's question to Jeffrey Hammer was a reference to other crimes to which the witness had entered pleas of guilty as a part of his plea bargain with the Commonwealth. Pursuant to a defense motion in limine, the trial court had ruled pre-trial that the prosecution was precluded from inquiring into Appellant's involvement, along with Jeffrey Hammer, in the commission of any crimes other than those related to the robbery and killing of Richard Boyer. The prosecutor's question to Hammer may have been a violation of the trial court's ruling on the motion in limine. However, because of a prompt objection by defense counsel, the witness did not answer the question, and Appellant was not identified as Hammer's accomplice in other, unrelated crimes. Under

these circumstances, the trial court did not abuse its discretion when it denied a defense motion for mistrial.

■■■ When reviewing averments of prosecutorial misconduct in the form of improper argument to the jury, the remarks of the prosecutor "must be evaluated in the context in which they occurred." *Commonwealth v. Smith,* 490 Pa. 380, 388, 416 A.2d 986, 989 (1980). *See also Commonwealth v. Carpenter,* 511 Pa. 429, 439, 515 A.2d 531, 536 (1986); *Commonwealth v. Toledo,* 365 Pa.Super. 224, 236, 529 A.2d 480, 486 (1987). "Generally, 'comments by the district attorney do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the [jurors], forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.'" *Commonwealth v. Strong,* 522 Pa. 445, 454, 563 A.2d 479, 483 (1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990), *(quoting Commonwealth v. McNeal,* 456 Pa. 394, 400, 319 A.2d 669, 673 (1974)). *See also Commonwealth v. Baker,* 511 Pa. 1, 17, 511 A.2d 777, 786 (1986); *Commonwealth v. Tabron,* 502 Pa. 154, 160, 465 A.2d 637, 639–640 (1983). In making closing argument, the prosecutor is permitted wide latitude and may address the jury with a certain degree of oratorical flair. *See Commonwealth v. Chester, supra* 526 Pa. at 599–600, 587 A.2d at 1377–1378.

[A] prosecutor, just as a defense attorney, must have reasonable latitude in presenting a case to the jury and must be free to present his or her arguments with "logical force and vigor." Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony. The prosecutor may always argue to the jury that the evidence establishes the defendant's guilt, although a prosecutor may not offer his personal opinion as to the guilt of the accused either in argument or in testimony from the witness stand. Nor may he or she express a personal belief and opinion as to the truth or falsity of evidence of defendant's guilt, including the credibility of a witness.

*Commonwealth v. D'Amato,* 514 Pa. 471, 489–490, 526 A.2d 300, 309 (1987) (citations omitted). *See also Commonwealth v. Bullock,* 384 Pa.Super. 269, 278–279, 558 A.2d 535, 539–540 (1989); *Commonwealth v. Yabor,* 376 Pa.Super. 356, 370–371, 546 A.2d 67, 74 (1988). In addition, "the prosecution may, in its closing address, attempt to meet the pleas and arguments made by defense counsel in his summation." *Commonwealth v. Brown,* 489 Pa. 285, 302 n. 6, 414 A.2d 70, 78–79 n. 6 (1980). *See also Commonwealth v. Van Cliff,* 483 Pa. 576, 584, 397 A.2d 1173, 1177 (1979), *cert. denied,* 441 U.S. 964, 99 S.Ct. 2412, 60 L.Ed.2d 1070 (1979); *Commonwealth v. Perkins,* 473 Pa. 116, 132–136, 373 A.2d 1076, 1084–1086 (1977). Thus, "a prosecutor's remark concerning the credibility of a witness does not constitute reversible error where it is 'motivated by, and was commensurate with the prior attacks [by defense counsel] upon the credibility of' the Commonwealth's witnesses." *Commonwealth v. Gwaltney,* 497 Pa. 505, 513, 442 A.2d 236, 240 (1982), (*quoting Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975)). *See also Commonwealth v. Johnson,* 527 Pa. 118, 588 A.2d 1303 (1991); *Commonwealth v. Barren,* 501 Pa. 493, 499, 462 A.2d 233, 235 (1983); *Commonwealth v. Perkins, supra.*

 With respect to the three witnesses called by the defense in this case, the prosecuting attorney said to the jury:

> Those three men are liars. Convicted robbers, convicted thieves, convicted burglars. They are testifying for whatever reason. You decide. One's a cousin, one doesn't know the man at all but he wants to testify anyway. The third man—

The strategy of the defense in this case had been to attack the credibility of the prosecution's chief witness, Jeffrey Hammer. Thus, the defense called three witnesses, Harold Houser, Antonio Estrada and Gregory Capwell, all of whom were former cell mates of Jeffrey Hammer. They testified to statements allegedly made by Hammer while in prison. Houser said that Hammer told him that Appellant had purchased a pistol on Hammer's behalf. This testimony was introduced to support the defense contention that the murder

weapon, while purchased by Appellant, had been owned by Hammer. Both Estrada, who is a cousin of Appellant, and Capwell testified that Hammer had told them that he expected a light sentence in return for his testimony against Appellant. Throughout his closing argument, defense counsel characterized Jeffrey Hammer as a "career criminal," a person with "no integrity whatsoever." As to Hammer's testimony, he suggested that: "His memory isn't that good. He would lead you to believe he's got a great memory. But he's lying, but he's lying, okay." Defense counsel also emphasized Hammer's lengthy criminal record and his plea bargain in exchange for his testimony against Appellant. Counsel concluded by offering the theory that Hammer had acted alone in robbing and killing Richard Boyer and was implicating Appellant to save his own life.

All of the defense witnesses had been impeached by convictions for *crimen falsi* offenses. Therefore, in light of the extensive attack by defense counsel upon the credibility of the Commonwealth's chief witness, we cannot say that the prosecutor's brief remark that the three defense witnesses were liars constituted prosecutorial misconduct. The prosecutor's remark was an appropriate, and indeed restrained, response to defense counsel's relentless attack upon the credibility of Jeffrey Hammer.

Appellant also argues that the prosecuting attorney improperly referred in his closing argument to the testimony of Jeffrey Hammer as "uncontroverted." There is no merit in this argument. The Superior Court has observed:

"[W]hile it is improper for a prosecuting attorney to refer to a defendant's failure to testify, it is not improper for the prosecutor to identify for the jury items of evidence which have been uncontradicted." *Commonwealth v. LaMassa,* 367 Pa.Super. 54, 57, 532 A.2d 450, 451 (1987). See also: *Commonwealth v. Jones,* 242 Pa.Super. 471, 476–477, 364 A.2d 368, 370–371 (1976); *Commonwealth v. Kloch, supra* 230 Pa.Super. at 588–590, 327 A.2d at 389–390. " 'To constitute error, the remark must go further, indicating a duty of the defendant to testify, and permitting an unfavorable

inference to be drawn from his failure to do so.'" *Commonwealth v. Kloiber,* 378 Pa. 412, 419, 106 A.2d 820, 824 (1954), *cert. denied,* 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954), quoting *Commonwealth v. Thomas,* 275 Pa. 137, 141, 118 A. 667, 668 (1922). " 'Reference to the failure of a defendant to testify on his own behalf, to constitute reversible error, must call the jury's attention to the fact that the defendant has not testified and must reasonably lead to an inference that he would have taken the stand if not guilty.' " *Commonwealth v. Kloiber, supra* 378 Pa. at 420–421, 106 A.2d at 825, quoting *Commonwealth v. Holley,* 358 Pa. 296, 300–301, 56 A.2d 546, 548 (1948).

*Commonwealth v. Ulen,* 414 Pa.Super. 502, 524–525, 607 A.2d 779, 790–791 (1992). *See also Commonwealth v. Byrd,* 409 Pa.Super. 611, 618–621, 598 A.2d 1011, 1015–1016 (1991).

██ The prosecutor's comment regarding the testimony of Jeffrey Hammer, when viewed in its proper context, was as follows:

How does the evidence in this case, how do the facts apply to the crimes charged? The simple issue again is, did David Sattazahn take the life of Richard Boyer then rob him? Right now Jeffrey Hammer's testimony is uncontroverted. He's—

MR. ELDER: Objection.

THE COURT: Sustained.

MR. BALDWIN: It's for you to decide what, if any, contradictions are in Jeffrey Hammer's story. If you believe the three defense witnesses, if you don't believe them, that's up to you. But Jeffrey told you it didn't happen, that they are lying.

Upon reviewing the whole of the prosecutor's closing argument, it is readily apparent that the prosecutor's reference to Hammer's testimony being uncontroverted was made in an effort to restrict the efficacy of the testimony which had been given by the three witnesses called by the defense, and not to call attention to the fact that Appellant had not testified on his own behalf. For this reason, the trial court denied a defense

motion for mistrial.[7] In so ruling, the trial court did not abuse its discretion.

 Appellant next argues that the trial court erred when it allowed the prosecutor to elicit from Jeffrey Hammer that, as a part of his plea bargain, he had agreed to testify truthfully against Appellant. At trial, his counsel had objected and the court had ruled as follows:

MR. ELDER: For the record I'm objecting to any testimony regarding the plea agreement where he promises to tell the truth when he testifies.

THE COURT: I'll let that come in. I think that's again part of the—part of the motivation to enter into an agreement on both sides here and part and parcel of the question of the corrupt motive or lack of corrupt motive to testify. All right.

Thereafter, on direct examination, the prosecuting attorney elicited the following testimony from Jeffrey Hammer:

Q Mr. Hammer, I ask you to take a look at Exhibit No. 55 marked by the Commonwealth. Do you recognize this seven page document?

A Yes, I do.

Q Take a look at each page.

A Yes, that's it.

Q Do you remember that?

A Yes.

Q As part of your plea agreement you have agreed to testify in this proceeding, have you not?

A Yes.

Q You agreed to cooperate with the police?

A Yes.

Q By truthful and honest testimony?

7. We observe also that, in its final charge, the trial court instructed the jury as follows:

It is entirely up to the defendant in every criminal trial whether or not to testify. He has an absolute right under the Constitution to remain silent. You must not draw any inference of guilt from the fact that he did not testify.

A Yes.

Q As a result of this agreement on February 5th of 1990 you pled guilty in this case, did you not?

A Yes, I did.

Q You pled guilty to murder in the third degree?

A Yes.

Q Robbery, possessing instruments of crime, criminal conspiracy to commit murder in the third degree, criminal conspiracy to commit robbery, criminal conspiracy to commit possessing instruments of crime and firearms not to be carried without a license?

A Yes.

Q As a result of that plea you expect to receive a sentence of 19 to 55 years?

A Yes.

THE COURT: That's incarceration, right?

THE WITNESS: Yes, sir.

In *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983), the defendant had been charged with murder as a result of a racial confrontation between two youth groups in the City of Pittsburgh. At trial, the Commonwealth called two witnesses who had been at the scene of the confrontation. They testified that the defendant had been present with a rifle in his hands. The Commonwealth also called as witnesses the two lawyers who had negotiated plea bargains on behalf of the two eyewitnesses. The lawyers testified that their clients had been advised of their right to remain silent and had agreed to waive their rights and to testify truthfully at the defendant's trial. With respect to such testimony, the Supreme Court held that the repeated references to the witnesses' Fifth Amendment right against self-incrimination had denied the defendant a fair trial. The Court reasoned as follows:

> In cases where the Commonwealth is informed of a witness' intention to assert a privilege against self-incrimination, we have held that it is reversible error to call that witness to the stand where it is likely that the jury will associate the witness with the defendant and the criminal

episode giving rise to the charges against the accused.... We believe the same prohibition pertains where the Commonwealth seeks to call to the attention of the jury the fact that a witness, who is associated with the accused in the activity giving rise to the criminal charges, has waived his Fifth Amendment rights against self-incrimination and is taking the witness stand to tell the truth. This tactic has the effect of emphasizing to the jury that the defendant, who is associated with the witness, has the same opportunity to waive his constitutional rights and tell the truth. The defendant is unduly prejudiced by this blantant [sic] invitation for the jury to draw an inference from the fact that the witness is foregoing his constitutional right against self-incrimination. This tends to spotlight the accused if he fails to do the same thing and clearly invites an improper prejudicial inference from the jury.

In the present case, the Commonwealth's use of this unwarranted tactic could only steer the jury to infer that since its witnesses, Patterson and Hill, waived their Fifth Amendment rights and willingly gave self-incriminating testimony, Patterson and Hill's testimony was the truth and entirely believable. Added to this is circumstance of the appellant Tann not taking the witness stand and failing to offer any testimony in his own defense. This invited the inference that, if he had testified and had told the truth, his testimony would have confirmed his guilt. It was entirely improper for the Commonwealth to invite such prejudicial inferences in the manner employed here.

*Commonwealth v. Tann, supra* at 603–604, 459 A.2d at 327–328 (footnote and citations omitted).

A similar situation arose in *Commonwealth v. Bricker,* 525 Pa. 362, 581 A.2d 147 (1990), where two Commonwealth witnesses had entered into plea agreements by which they agreed to provide truthful testimony at the defendant's trial. There, the agreements were entered into evidence by the Commonwealth and were sent out with the jury during its deliberations. The Supreme Court held that the trial court had

abused its discretion by permitting the plea agreements to go out with the jury, reasoning as follows:

> In the plea agreement entered into among Rossi, the United States of America and the Commonwealth of Pennsylvania, Rossi agreed, inter alia, to "provide complete and truthful information to ... the Commonwealth of Pennsylvania ... and testify ... as required." Rossi also agreed therein to "provide complete and truthful information concerning any and all illegal activities in which [he] participated." Additionally, Rossi agreed to provide "complete and truthful information" about the deaths of Gary DeStefano and Thomas Sacco, among others. The agreement also stated that "if at any time it is determined ... that Rossi ... has not provided complete and truthful information as called for in this agreement ... or has at any time knowingly made a false statement under oath in connection with the terms of this agreement, [he] will be subjecting himself to a prosecution for perjury...." Kellington entered into a plea agreement of virtually identical language.

> The documents which formalized these two agreements were then signed by the United States Attorney for the Western District of Pennsylvania, the District Attorney of Allegheny County, the Attorney General for the Commonwealth of Pennsylvania, Rossi and Kellington respectively, and the Attorneys who individually represented Rossi and Kellington at the time. The signatories to these agreements, by executing the documents, placed the imprimatur of their offices as support for the proposition that Rossi and Kellington were telling the truth.

> It is beyond question that permitting the prosecution to send these documents out with the jury during deliberations impermissibly bolstered the credibility of Charles Rossi and Charles Kellington. In so bolstering their credibility, the court violated the defendant's right to a fair trial.

> . . . .

> In the case sub judice, the introduction of the plea agreements served as silent witnesses, causing the same prejudice to appellant as we held to be reversible error in

[*Commonwealth v. Tann,* 500 Pa. 593, 459 A.2d 322 (1983) ]. With the agreements before them, the jurors could reasonably infer that appellant had the same opportunity as Rossi and Kellington to cooperate with the investigation of Thomas Sacco's death, and chose to remain silent. The fact that appellant did not take the stand in his own defense further bolsters his claim that there is a reasonable possibility that this error might have contributed to the verdict. [*Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978) ].

The Commonwealth argues that the plea agreements had to be revealed to the jury; and had they not been revealed the Commonwealth would now be attacked for misconduct. This argument avoids the real issue. It would have been appropriate for the Commonwealth to reveal the existence of the agreements, and the parameters thereof, through the testimony of the witnesses. If they still felt it necessary to enter the documents into evidence they simply could have redacted portions of the agreements to delete the prejudicial aspects, as requested by defense counsel, prior to submission of them to the jury. To allow the jurors to read these unredacted documents at their leisure during deliberations runs afoul of the *Tann* case and the requirements of fundamental fairness.

*Commonwealth v. Bricker, supra* at 377–379, 581 A.2d at 154–155.

The circumstances of the instant case are distinguishable from those in *Tann* and *Bricker.* Here, the prosecuting attorney merely questioned Jeffrey Hammer in order to disclose the existence of his plea agreement with the Commonwealth and to establish the parameters of that agreement. No attempt was made to establish or imply to the jury that Hammer was giving up his right to remain silent in order to testify against Appellant, nor did Hammer's testimony give rise to a negative inference because of Appellant's failure to testify at trial. The assistant district attorney questioned Hammer briefly only to establish the terms of his agreement with the Commonwealth. Such a course of conduct is consistent with the Supreme Court's observation in *Commonwealth*

*v. Bricker, supra,* that it would be appropriate for the Commonwealth to reveal the existence and parameters of a plea agreement through the testimony of the witness who had entered the agreement. *Id.* at 379, 581 A.2d at 155.[8] We hold, therefore, that the testimony that Hammer was to be given a stated sentence for giving truthful testimony, without more, was not error entitling Appellant to a new trial.

■■■ Finally, Appellant contends that the trial court committed reversible error when it refused to instruct the jury consistently with the following requested point for charge:

6. If you, the jury, find that two conclusions can be equally drawn from the evidence, one tending to establish guilt and the other tending to establish innocence of the crimes charged, it is your duty to accept the conclusion of innocence and acquit the Defendant, David Sattazahn.

Appellant argues that the trial court's failure to give this requested jury instruction compels the granting of a new trial. We disagree.

"In reviewing jury instructions to determine whether reversible error has been committed by a trial court, we consider the charge as a whole. Error will not be predicated on isolated excerpts. Rather, it is the general effect of the charge that controls." *Commonwealth v. Myers,* 376 Pa.Super. 41, 50, 545 A.2d 309, 314 (1988). *See also Commonwealth v. Bowers,* 400 Pa.Super. 377, 392, 583 A.2d 1165, 1172 (1990); *Commonwealth v. Riggins,* 374 Pa.Super. 243, 253, 542 A.2d 1004, 1009 (1988). "A trial court is not required to accept requested instructions verbatim. The key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." *Commonwealth v. Cimorose,* 330 Pa.Super. 1, 10, 478 A.2d 1318, 1323 (1984) (citations omitted). *See also Commonwealth v. Faulkner,* 528 Pa. 57, 79, 595 A.2d 28, 40 (1991), *cert. denied,* —— U.S. ——, 112

---

**8.** Although marked as an exhibit, the plea agreement between Jeffrey Hammer and the Commonwealth was not introduced into evidence at Appellant's trial, nor was it viewed by the jury or sent out with the jury during deliberations.

S.Ct. 1680, 118 L.Ed.2d 397 (1992); *Commonwealth v. Prosdo-cimo,* 525 Pa. 147, 150, 578 A.2d 1273, 1274 (1990); *Commonwealth v. Ohle,* 503 Pa. 566, 582, 470 A.2d 61, 70 (1983), *cert. denied,* 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986). Therefore, " '[t]he refusal to give a proper instruction requested by a [defendant] is ground for a new trial only if the substance thereof has not otherwise been covered by the trial court's general charge.' " *Commonwealth v. LaMassa,* 367 Pa.Super. 54, 58, 532 A.2d 450, 452 (1987), *(quoting Werner v. Quality Service Oil Co., Inc.,* 337 Pa.Super. 264, 269, 486 A.2d 1009, 1011 (1984)).

After careful review of the trial court's jury charge, we are satisfied that the court did not commit reversible error by refusing to recite verbatim Appellant's requested point for charge. The jury was fully and adequately instructed on the Commonwealth's burden of proving Appellant's guilt beyond a reasonable doubt. Its instructions with respect thereto were free of error.

Appellant argues additionally that the trial court erred by refusing to recite for the jury his requested point for charge pertaining to the intent necessary to establish the crime of conspiracy to commit third degree murder. However, we have already determined that insufficient evidence was presented to convict Appellant of this offense, and we will cause his conviction therefore to be vacated. As such, it is unnecessary to review the jury instruction which was given with respect to the charge of conspiracy to commit third degree murder.

Reversed and remanded for a new trial on all charges except those for conspiracy to commit third degree murder and the two counts of conspiracy to commit aggravated assault. With respect to such conspiracy charges, judgment is arrested and the charges are dismissed. Jurisdiction is not retained.

WIEAND, J., files a Concurring Statement.

448

WIEAND, Judge, concurring:

I concur. In my judgment, however, the intention of the legislature in adopting 18 Pa.C.S. § 6104 was clear. The trial court was of the same opinion. Despite expressed misgivings, the trial court in this case charged the jury almost precisely as the legislature had provided.

I agree with the majority, for the reasons which it has so well expressed, that the trial court's jury instruction deprived appellant of a fair trial. Having wrestled with and tried to understand the statutory provision on this and numerous prior occasions, however, I am persuaded that to the extent it supports a jury instruction such as was given in this case, the statute is arbitrary, irrational and unconstitutional. Therefore, I would so hold. By taking this step, we might well be able to prevent trial courts in the future from falling into the same error which the statute caused in this case.